

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION



MAR 3 1 2005

CLERK'S OFFICE
DETROIT

DOMINIC CAMPBELL,

   Petitioner,

           CASE NO. 03-CV-73398-DT
v.          JUDGE GERALD E. ROSEN
           MAGISTRATE JUDGE PAUL J. KOMIVES

PAUL H. RENICO,

   Respondent.

_____/

## REPORT AND RECOMMENDATION

*Table of Contents*

I.  RECOMMENDATION ................................................................. 1
II.  REPORT ............................................................................ 1
  A.  *Procedural History* .......................................................... 1
  B.  *Factual Background Underlying Petitioner's Conviction* ...................... 4
  C.  *Procedural Default* .......................................................... 6
  D.  *Standard of Review* .......................................................... 10
  E.  *Prosecutor's Use of False Prior Bad Acts Evidence (Claims II & III)* ........ 12
    1.  *False Testimony* ....................................................... 14
    2.  *Prior Bad Acts* ........................................................ 15
  F.  *Ineffective Assistance of Counsel (Claims I & IV)* .......................... 18
    1.  *Clearly Established Law* ................................................ 18
    2.  *Trial Counsel* ......................................................... 19
    3.  *Appellate Counsel* ..................................................... 21
  G.  *Evidentiary Hearing* ........................................................ 22
  H.  *Conclusion* ................................................................. 23
III.  NOTICE TO PARTIES REGARDING OBJECTIONS ....................................... 23

\*   \*   \*   \*   \*

I.  <u>RECOMMENDATION</u>: The Court should deny petitioner's application for the writ of

habeas corpus. The Court should also deny petitioner's motion for an evidentiary hearing.

II.  <u>REPORT</u>:

A.  *Procedural History*

  1.  Petitioner Dominic Campbell is a state prisoner, currently confined at the St. Louis

Correctional Facility in St. Louis, Michigan.

    2.     On May 9, 1997, petitioner was convicted of one count of first degree murder, MICH.

COMP. LAWS § 750.316, following a jury trial in the Monroe County Circuit Court.  On June 17,

1997, he was sentenced to a mandatory term of life imprisonment without possibility of parole.

    3.     Petitioner appealed as of right to the Michigan Court of Appeals raising, through

counsel, the following claims:

    I.     DEFENDANT-APPELLANT'S CONVICTIONS SHOULD BE REVERSED
             BECAUSE THERE WAS INSUFFICIENT EVIDENCE TO FIND FOR THE
             OFFENSE OF PREMEDITATED MURDER; ALTERNATIVELY, THE
             MOTION FOR DIRECTED VERDICT SHOULD HAVE BEEN
             GRANTED.

    II.    DEFENDANT-APPELLANT IS ENTITLED TO A NEW TRIAL BECAUSE
             THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING THE
             MOTION FOR A NEW TRIAL.

    III.   DEFENDANT-APPELLANT'S CONVICTION SHOULD BE REVERSED
             BECAUSE THE TRIAL COURT IMPROPERLY FOUND THE
             STATEMENT OF DEFENDANT TO BE VOLUNTARY.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence.

*See People v. Campbell*, No. 204352, 2000 WL 33421255 (Mich. Ct. App. May 5, 2000) (per

curiam).

    4.     Petitioner, proceeding *pro se*, sought leave to appeal these three issues to the

Michigan Supreme Court.  In addition, petitioner raised two additional grounds for relief:

    I.     DEFENDANT-APPELLANT'S CONVICTION SHOULD BE REVERSED
             BECAUSE DEFENDANT-APPELLANT WAS PREJUDICED BY PRIOR
             BAD ACTS WHICH WERE INTRODUCED WITHOUT SUBSTANTIAL
             EVIDENCE PROVING DEFENDANT-APPELLANT PERPETRATED
             THEM.

    II.    DEFENDANT-APPELLANT'S CONVICTION SHOULD BE REVERSED
             BECAUSE OF INEFFECTIVE ASSISTANCE OF COUNSEL.

The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Campbell*, 463 Mich. 905, 618 N.W.2d 911 (2000).

5.      On October 24, 2001, petitioner filed a motion for relief from judgment in the trial court pursuant to MICH. CT. R. 6.500-.508, claiming: (1) ineffective assistance of trial counsel; (2) ineffective assistance of appellate counsel; (3) improper admission of prior acts evidence; and (4) denial of a fair trial by the prosecutor's use of false evidence. The trial court denied petitioner's motion on the merits. *See People v. Campbell*, No. 96-27285-FC (Monroe County, Mich., Cir. Ct. Jan. 10, 2002).

6.      Petitioner sought leave to appeal this decision to the Michigan Court of Appeals, raising the following claims:

I.      DEFENDANT-APPELLANT'S CONVICTION SHOULD BE REVERSED BECAUSE DEFENDANT WAS DENIED [HIS] 14TH AMENDMENT RIGHT TO DUE PROCESS BY PRIOR ACTS HAVING BEEN WRONGFULLY ADMITTED AT TRIAL.

II.     DEFENDANT-APPELLANT'S CONVICTION SHOULD BE REVERSED BECAUSE DEFENDANT WAS DENIED [HIS] 6TH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.

III.    DEFENDANT-APPELLANT'S CONVICTION SHOULD BE REVERSED BECAUSE DEFENDANT WAS DENIED [HIS] 14TH AMENDMENT RIGHT TO DUE PROCESS BY [THE] PROSECUTOR'S KNOWING USE OF FALSE EVIDENCE/TESTIMONY.

In addition, to excuse his failure to raise these claims on direct appeal petitioner asserted that appellate counsel was ineffective for failing to raise them on direct appeal. The Michigan Court of Appeals denied petitioner's application in a standard order, based on petitioner's "failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Campbell*, No. 245130 (Mich. Ct. App. Mar. 27, 2003).

3

7.     Petitioner sought leave to appeal in the Michigan Supreme Court, raising these same three claims. The Michigan Supreme Court denied petitioner's applications for leave to appeal in a standard order based on petitioner's "failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *See People v. Campbell*, 468 Mich. 917, 662 N.W.2d 751 (2003).

8.     Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on September 21, 2003. As grounds for the writ of habeas corpus, he raises the four claims that he raised in his state court motion for relief from judgment.

9.     Respondent filed his answer on April 13, 2004. He contends that petitioner's claims are barred by petitioner's procedural default in the state courts.[1]

10.    Petitioner filed a reply to respondent's answer on April 23, 2004. He contends that his habeas claims are not defaulted.

B.     *Factual Background Underlying Petitioner's Conviction*

The factual background leading to petitioner's conviction was summarized by the Michigan Court of Appeals on petitioner's direct appeal:

Defendant's conviction stems from the killing of his two month old daughter, Dymond. At around 1:15 a.m. on December 2, 1995, Dymond awoke and began to cry. Defendant told his wife, Kristen Savage-Campbell, that he would see to their daughter. At approximately 6:30 a.m., Kristen was awakened by defendant's screams. Rushing into the living room, Kristen found the child lying on the floor, dressed in her diaper and socks. Defendant was on the telephone, apparently making a 911 call. While waiting for help, defendant performed CPR on Dymond, following the instructions given to him over the phone by the 911 operator. On-scene emergency personnel were unable to revive the child. She was then transported by ambulance to Mercy Memorial Hospital in Monroe, Michigan, and later by helicopter to St. Vincent's Medical Center in Toledo, Ohio. Dymond was pronounced brain dead by

---

[1]Respondent previously filed a motion for summary judgment, seeking dismissal of petitioner's habeas application on statute of limitations grounds. That motion was denied by the Court.

4

doctors at St. Vincent's at approximately 4:30 p.m. Thereafter, all life support was terminated.

*Campbell*, 2000 WL 33421255, at *1, slip op. at 1. The court, in resolving petitioner's claims, also

summarized the evidence presented by the prosecutor:

> Dr. Vipul Patel, Dymond's primary attending physician at St. Vincent's Medical Center, testified that by the time he saw her, Dymond's brain functions and brain stem activity had irreversibly ceased. He noted several head injuries, including subdural hematoma and retinal hemorrhages. He also testified about a linear skull fracture that ran all along the right side of Dymond's head. Dr. Patel testified that this injury could have occurred only if Dymond's head had come into contact with an object. Dr. Patel indicated that it would take a tremendous blow to inflict such an injury.
>
> Dr. Diane Barnett, who performed the autopsy on Dymond, testified that the cause of death was cranial cerebral injuries that resulted from child abuse. Dr. Barnett noted that the skull fracture was approximately nine centimeters, and that it ran around the right side of the child's head, around the back, and extended a little bit onto the left side. Dr. Barnett testified that it would take a force equivalent to that sustained in a high speed motor vehicle accident or a fall from the fourth or fifth story of a building to inflict such a fracture. She also rejected the assertion that such an injury could be caused by a five or six foot fall from a caregiver's arms. Dr. Barnett also testified that Dymond had eight older rib fractures that were in the process of healing when she died. Dr. Mark Sherrard, Dymond's pediatric physician, testified that in addition to the rib fractures, he had noted in October 1995 that Dymond had a fracture to her left tibia.
>
> In addition to this medical testimony, the prosecution presented the testimony of John Howell, a jailhouse informant who had been in the Monroe County Jail with defendant. According to Howell, defendant told him that on the night Dymond was killed, "he had been in a rage, or something, and he was shaking his baby and had like slammed it against a wall or something or the floor. He said-that when he had the baby on the floor, he grabbed it by the face and like mashed it into the floor."
>
> There was also the testimony of Detective Thomas Redmond of the Monroe County Sheriff's Department. Detective Redmond testified that on December 3, 1995, he spoke with defendant down at the station house. According to Detective Redmond, defendant admitted that he had killed Dymond, although he became defiant when Detective Redmond indicated his belief that the killing was deliberate. Detective Redmond also stated that defendant admitted to being jealous of the baby because Dymond got too much of her mother's attention.

*Id.* at *2, slip op. at 2-3. Finally, the court of appeals summarized the evidence presented by

petitioner in his defense:

5

Defendant was the only witness called to testify on his behalf. He testified that at approximately 5:00 a.m. on December 2, Dymond woke up after sleeping for some time in his arms while he slept in a living room chair. After initially going over and sitting on a couch, defendant stated he decided to put the child in her crib after she started to once again drift off to sleep. As he rose, Dymond suddenly moved and fell out of his arms to the carpeted floor. He indicated that the child was still conscious and alert after the fall. He then took her to her crib. When Dymond again started to cry, defendant testified that Kristen got up and attended to the child. Defendant indicated he then went into the living room. While he was sitting down, he stated he heard over the child intercom the sound of something hitting the waterbed in the bedroom. Kristen then brought the child out on a pillow and asked defendant to take care of her. Defendant stated he placed the child on the couch, and went into the kitchen to get a bottle. When he returned, defendant testified he saw the child stop breathing. Defendant denied ever talking to Howell or to delivering a blow to Dymond's head.

*Id.* at *3, slip op. at 3-4.

C.    *Procedural Default*

Respondent first contends that petitioner's claims are barred by petitioner's procedural default in the state courts, because petitioner failed to raise these claims on direct appeal. The Court should disagree.

Under the procedural default doctrine, a federal habeas court will not review a question of federal law if the state court's decision rests on a substantive or procedural state law ground that is independent of the federal question and is adequate to support the judgment. *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991). However, "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on the procedural bar." *Harris*, 489 U.S. at 263. Furthermore, "only a 'firmly established and regularly followed state practice' may be interposed by a State to prevent subsequent review . . . of a federal constitutional claim." *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) (quoting *James v. Kentucky*, 466 U.S. 341, 348-51 (1984));

see also, *Calderon v. United States Dist. Ct. for the E. Dist. of Cal.*, 96 F.3d 1126, 1129 (9th Cir. 1996) (internal quotation omitted) ("For the procedural default doctrine to apply, a state rule must be clear, consistently applied, and well-established at the time of the petitioner's purported default.").

Here, petitioner first presented his purportedly defaulted habeas claims in his motion for relief from judgment. Michigan Court Rule 6.508, governing motions for relief from judgment, provides that the movant "bears the burden of establishing entitlement to relief." MICH. CT. R. 6.508(D). The rule goes on to provide, in three separately numbered paragraphs, procedural situations in which relief will not be granted: (1) where an appeal relating to the conviction is pending; (2) where the claim has already been ruled upon in a prior appeal or postconviction motion; and (3) where the claim could have been raised in a prior appeal or postconviction motion but was not. *See* MICH. CT. R. 6.508(D)(1)-(3).

The Michigan Court of Appeals and the Michigan Supreme Court both rejected petitioner's appeal based on his "failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *See People v. Campbell*, 468 Mich. 917, 662 N.W.2d 751 (2003); *People v. Campbell*, No. 245130 (Mich. Ct. App. Mar. 27, 2003). Looking at the structure of Rule 6.508(D), it would appear that this language indicates that petitioner failed to meet the substantive burden of entitlement to relief, rather than failed to comply with one of the procedural aspects of the rule. This, in turn, would not constitute an invocation of a state procedural default barring habeas review of petitioner's claims. Respondent, however, relies on the Sixth Circuit's decision in *Simpson v. Jones*, 238 F.3d 399 (6th Cir. 2000), in which the court held otherwise and concluded that this identical language constitutes an invocation of the procedural aspects of Rule 6.508(D), and thus bars federal habeas review. *See Simpson v. Jones*, 238 F.3d 399, 408 (6th Cir. 2000).

7

Were *Simpson* the last word on the matter, this Court would of course be bound to follow the Sixth Circuit's holding. However, a more recent decision by the Sixth Circuit has limited the breadth of the *Simpson* rule, rendering it inapplicable here. In *Abela v. Martin*, 380 F.3d 915 (6th Cir. 2004), the Court explained that its previous decisions in *Simpson* and *Burroughs v. Makowski*, 282 F.3d 410 (6th Cir. 2003), were based on the fact that the lower state courts in those cases had expressly invoked the procedural aspect of Rule 6.508(D)(3), and therefore the court could be fairly certain that the Michigan Supreme Court's citation to "MCR 6.508(D)" was intended as an invocation of the procedural aspect of that rule. In *Abela*, however, the lower courts had addressed the petitioner's claims on the merits, and this was enough to distinguish *Simpson* and *Burroughs*, as the court explained:

> In short, unlike in *Simpson* and *Burroughs*, the state courts below the supreme court never invoked a procedural bar here, but rather repeatedly ruled on the merits. The procedural circumstances in this case are, therefore, materially different from those in *Simpson* and *Burroughs*, where the lower state courts actually invoked a procedural bar, making it clearer that the Michigan Supreme Court was also invoking such a bar when it referred to M.C.R. 6.508(D). But given that all of the lower state courts adjudicated Abela's case on the merits, it is not at all clear that the Michigan Supreme Court's summary order relies on a procedural bar, as opposed to the non-procedural reason that Abela simply failed to meet his burden of "establishing entitlement to the relief requested." Indeed, given the line of prior merits determinations in Abela's case, it is just as reasonable to presume that the Michigan Supreme Court's reference to M.C.R. 6.508(D) signaled its agreement with the lower courts' merits determinations as it is to presume that the reference signaled, for the first time in this case, the invocation of a procedural bar.
>
> In short, the procedural facts of *Simpson* and *Burroughs* are distinguishable from our case. The facts in *Simpson* and *Burroughs* inspired greater certainty that the Michigan Supreme Court actually relied on a procedural bar in rendering its judgment. No such clarifying indicators are present here. Moreover, *Simpson* and *Burroughs* do not purport to eviscerate our Circuit's rule that a state procedural rule is an "independent and adequate" state ground only if the state court rendering judgment in the case "clearly and expressly stated that its judgment rested on a procedural bar." *Sparkman*, 94 F.3d at 202. *Simpson* and *Burroughs* did not hold that we should divine procedural default from any and all references to M.C.R. 6.508(D) where such default may actually have occurred, but where the procedural history

raises genuine questions as to the state court's actual reliance on a procedural bar. To
suggest that those cases did so hold is to accept that they invert the inquiry into
whether federal review of the habeas claims is permitted. That is, pursuant to *Maupin
v. Smith*, 785 F.2d 135 (1986), whether the petitioner actually failed to comply with
a procedural rule is only the predicate, not the ultimate, question before us. The
ultimate legal questions are whether the court relied on and expressly invoked that
procedural bar and whether it is an "independent and adequate" ground for
precluding review. *See Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir.2001). If a state
court is slurring its words, our job is not to guess what it might be saying, but rather
to demand that it enunciate more clearly. Here, because of numerous factors--the
Michigan Supreme Court's reference only to M.C.R. 6.508(D), the absence of a clear
and express invocation of a procedural bar, and the plausibility, based on the prior
state courts' merits rulings, that the Michigan Supreme Court, too, grounded its
decision in a non-procedural reason based on Abela's failure to "establish[]
entitlement to relief"–we cannot find that M.C.R. 6.503(D)(3), the state procedural
rule urged by Respondent, was actually relied on by the Michigan Supreme Court in
this case. For the same reasons, we cannot find that M.C.R. 6.503(D) constitutes an
adequate and independent basis for the state supreme court's decision here.

*Abela*, 380 F.3d at 923-24; *see also, Williams v. Jones*, 231 F. Supp. 2d 586, 597 (E.D. Mich. 2002)

(Lawson, J.).

Here, as in *Abela*, the trial court did not reject petitioner's claims on the basis of his failure

to raise those claims on direct appeal, *i.e.*, under the procedural rule set forth in Rule 6.508(D)(3).

Rather, the trial court found that petitioner's claims were without merit and that any alleged errors

were harmless. *See People v. Campbell*, No. 96-27285-FC, at 2 (Monroe County, Mich., Cir. Ct.

Jan. 10, 2002). Indeed, respondent describes that trial court's decision as a resolution on the merits.

*See* Resp't's Answer in Opp'n to Pet., at 11 ("In any case, the state trial court examined Petitioner's

claims on collateral review and found no error in the admission of evidence, concluding that even

if there was error, it was harmless[.]"). Thus, in the legally relevant respects this case is identical

to *Abela*, and under that decision petitioner's claims are not defaulted.  Accordingly, the Court

should conclude that petitioner's claims are not barred by a procedural default.

Further, even were the Court to conclude that petitioner's claims are procedurally defaulted,

9

it is still necessary to consider the claims on the merits. As noted above, petitioner can still have his defaulted claims reviewed on the merits if he can show cause for, and prejudice attributable to, his default in the state courts. Petitioner contends that his appellate counsel was ineffective for failing to raise these claims on direct appeal. If petitioner's position is correct, counsel's ineffectiveness may constitute cause to excuse any procedural default. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Murray v. Carrier*, 477 U.S. 478, 488 (1986). To demonstrate that appellate counsel was ineffective petitioner must show, *inter alia*, that his claims would have succeeded on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *McCleese v. United States*, 75 F.3d 1174, 1180 (7th Cir. 1996). Given that the cause and prejudice inquiry merges with an analysis of the merits of petitioner's defaulted claims, it is better to simply consider the merits of these claims, even if they are defaulted. *See Jamison v. Collins*, 100 F. Supp. 2d 647, 676 (S.D. Ohio 2000); *Watkins v. Miller*, 92 F. Supp. 2d 824, 832 (S.D. Ind. 2000); *cf. Strickler v. Greene*, 527 U.S. 263, 282 (1999) (considering merits of petitioner's habeas claims where inquiry into the merits mirrored cause and prejudice inquiry).

D.     *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also, Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also, Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also, Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also, Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the

11

Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also, Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp. 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

E.   *Prosecutor's Use of False Prior Bad Acts Evidence (Claims II & III)*

Petitioner's claims all relate to the prosecution's introduction of evidence that he had caused previous injuries to the victim. As the Michigan Court of Appeals noted, there was medical evidence that the victim had sustained injuries to her ribs prior to the night she was killed. Petitioner's wife testified at trial that petitioner admitted to squeezing the baby in a telephone conversation which was recorded. Specifically, petitioner's wife testified:

12

Q:    During any of these phone calls, did you talk about any of these rib injuries to, uh, Dymond?

A:    He had told me on the phone, that, he never fell with her. That he held her up and squeezed her.

Trial Tr., Vol. II, at 19-20. On cross-examination, however, defense counsel impeached petitioner's

wife with the transcript of the telephone call:

Q:    Okay. And, is it your sworn testimony, here, today, that Dominic said that he squeezed the child's ribs?

A:    Squeezed—"held her up and squeezed her", were his exact words.

Q:    These were his exact words?

A:    Yes.

Q:    And, did this conversation involve a, uh, uh, any discussion about, about him telling you about getting in some trouble at the jail, and getting disciplined or something?

A:    I don't recall that.

Q:    Did this conversation occur on any other occasion, other than the one occasion that you are telling us about?

A:    I had brought it up, but it was never clarified, as to exactly what he had done.

Q:    Okay, even after talking to him, it was not clear exactly what he had done. Isn't that true?

A:    In my mind, it was.

*Id.* at 61. Counsel then allowed petitioner's wife to look at a transcript of the phone conversation

to refresh her recollection, after which the testimony continued:

Q:    Does this refresh your recollection about what he said about the ribs?

A:    It's there.

Q:    Do you believe this is accurate?

A:    I assume it is.

Q:    Okay. Would it be fair to say that at no time, in this conversation did Dominic say that he squeezed the child's ribs?

A:    Yes, sir.

Q:    That's fair.

A:    In that document.

Q:    That is a fair statement, isn't it? The word "squeezed" never appears? Correct? No synonym for the word "squeezed" appears, does it?

A:    No, sir.

Q:    Having seen that, and having considered your position a little bit more, is it still your testimony that he told you, that he squeezed the child's ribs?

A:    If it's there, he must not have said that he squeezed it, but that is how I

13

accepted it, and I do believe that is how it was meant to come across.

Q:      But he didn't say that, did he?

A:      Not directly, according to the document.

*Id.* at 63-64. On redirect examination, the prosecutor again allowed petitioner's wife to look at the

transcript of the conversation, and then asked:

Q:      What was it from that conversation that you had with Mr. Campbell that lead
        you to believe that he had squeezed her ribs?
        * * * *

A:      He had, in one statement in a comment, he said that he remembers that his
        hands were wrapped around her little body. And then, he  I said, "so you
        never fell with her", and he said, "no".

Q:      Thank you. And was this talking about the ribs?

A:      Yes, sir.

*Id.* at 70-71.

Petitioner claims that his wife's testimony that he squeezed their baby's ribs was false, and

that he was denied a fair trial by the introduction of other bad acts evidence.

1.      *False Testimony*

Petitioner first claims that his wife's testimony was false. There is no question that Mrs.

Campbell's testimony that petitioner said, in his own words, that he had squeezed the baby, was

false. Nor is there any question that, as a general rule, a defendant is denied due process where the

prosecution knowingly presents false testimony, or allows testimony which it knows to be false to

go uncorrected. *See Giglio v. United States*, 405 U.S. 150, 153 (1972); *Napue v. Illinois*, 360 U.S.

264, 269 (1959).

It is equally clear, however, that relief on a presentation of false evidence claim is appropriate

only when there is a reasonable likelihood that the jury relied on the false evidence. *See Giglio*, 405

U.S. at 154; *Napue*, 360 U.S. at 271. Here, petitioner's wife admitted on cross-examination, after

being confronted with the transcript, that petitioner never actually said that he had squeezed the baby.

14

Because Mrs. Campbell's false testimony was exposed on cross-examination, there is no reasonable likelihood that it affected the jury's verdict. *See United States v. Vaziri*, 164 F.3d 556, 564 (10th Cir. 1999); *United States v. Rodriguez-Andrade*, 62 F.3d 948, 951 (7th Cir. 1995); *United States v. Knight*, 867 F.2d 1285, 1290 (11th Cir. 1989). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

2. *Prior Bad Acts*

Petitioner also contends that he was denied a fair trial by the admission of other prior bad acts evidence, namely, evidence that the victim had suffered previous injuries at petitioner's hand. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

It is well established that habeas corpus is not available to remedy a state court's error in the application of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Thus, unless a violation of a state's evidentiary rule results in the denial of fundamental fairness, an issue concerning the admissibility of evidence does not rise to the level of a constitutional magnitude. *See Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Davis v. Jabe*, 824 F.2d 483, 487 (6th Cir. 1987). "[A] federal habeas court has nothing whatsoever to do with reviewing a state court ruling on the admissibility of evidence under state law. State evidentiary law simply has no effect on [a court's] review of the constitutionality of a trial, unless it is asserted that the state law itself violates the Constitution." *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993). As the Sixth Circuit has noted, "[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial."

15

*Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994).

In short, "[o]nly when the evidentiary ruling impinges on a specific constitutional protection or is so prejudicial that it amounts to a denial of due process may a federal court grant a habeas corpus remedy." *Barrett v. Acevedo*, 169 F.3d 1155, 1163 (8th Cir. 1999); *see also, Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001). Where a specific constitutional right–such as the right to confront witnesses or to present a defense–is not implicated, federal habeas relief is available only if the allegedly erroneously admitted evidence "is almost totally unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983).

Both the Supreme Court and the Sixth Circuit have repeatedly held that a defendant is not denied a fair trial by the admission of prior bad acts evidence which is relevant in the defendant's trial. *See Estelle*, 502 U.S. at 69-70; *Dowling v. United States*, 493 U.S. 342, 353-54 (1990); *Coleman v. Mitchell*, 268 F.3d 417, 439-40 (6th Cir. 2001); *Pennington v. Lazaroff*, 13 Fed. Appx. 228, 232 (6th Cir. 2001) (per curiam) (unpublished); *Manning v. Rose*, 507 F.2d 889, 893-95 (6th Cir. 1974). Further, there is no clearly established Supreme Court precedent prohibiting the introduction of such evidence, and thus the admission of this evidence was not contrary to, or an unreasonable application of, clearly established federal law upon which habeas relief may be granted. *See Bugh v. Mitchell*, 329 F.3d 496, 512-13 (6th Cir. 2003).

Petitioner nevertheless contends that he was denied a fair trial by the introduction of this evidence because there was no proof that he had caused the injuries. With respect to the rib fractures, petitioner contends that apart from his wife's false testimony, there was no evidence as to when the rib fractures occurred or how the injuries were caused. Petitioner also contends that the

16

prosecution introduced evidence that the baby had fractured her tibia and had a bruise on her thigh,

even though there was no evidence as to the cause of these injuries, and even though they were not

the subject of the trial court's ruling permitting the prosecutor to introduce the evidence relating to

the rib injuries. Petitioner's argument, however, was expressly rejected by the Supreme Court in

*Estelle, supra.* In that case, the prosecution introduced evidence of the child victim's previous

injuries to show that the child's death was not accidental. The Court found that the introduction of

this evidence did not deprive the petitioner of due process notwithstanding the fact that there was

no evidence that the petitioner had caused the prior injuries. The Court explained:

> [E]vidence demonstrating battered child syndrome helps to prove that the child died
> at the hands of another and not by falling off a couch, for example; it also tends to
> establish that the "other," whoever it may be, inflicted the injuries intentionally.
> When offered to show that certain injuries are a product of child abuse, rather than
> accident, evidence of prior injuries is relevant *even though it does not purport to*
> *prove the identify of the person who might have inflicted those injuries.* Because the
> prosecution had charged McGuire with second-degree murder, it was required to
> prove that Tori's death was caused by the defendant's intentional act. Proof of Tori's
> battered child status helped to do just that; although not linked by any direct evidence
> to McGuire, the evidence demonstrated that Tori's death was the result of an
> intentional act by *someone*, and not accident. . . . We conclude that the evidence of
> prior injuries presented at McGuire's trial, whether it was directly linked to McGuire
> or not, was probative on the question of the intent with which the person who caused
> the injuries acted.

*Estelle,* 502 U.S. at 68-69 (citations omitted) (first emphasis added); *see also, Givens v. Yukins,* No.

98-2429, 2000 WL 1828484, at *5 (6th Cir. Dec. 5, 2000) (describing *Estelle* as holding "that

admission of evidence of prior rib fracture and rectal tearing suffered by an infant girl to establish

battered child syndrome did not violate due process, even though such evidence only served to

establish that the infant had been intentionally killed by someone, not specifically defendant.").

Here, as in *Estelle,* the prosecution was required to prove that petitioner intentionally caused

the victim's death in order to sustain its burden of proof on the first degree murder charge. And, as

17

in *Estelle*, the evidence of prior injuries, even if not directly connected to petitioner, was relevant to establishing that the victim's death was the result of an intentional act by someone.[2] Further, contrary to petitioner's argument, there was some evidence connecting him to the injuries. "The proof of [the victim's injuries] itself narrowed the group of possible perpetrators to [petitioner] and his wife, because they were the only two people regularly caring for [Dymond] during her short life." *Estelle*, 502 U.S. at 74. It was the province of the jury to resolved the credibility contest between petitioner and his wife. Further, the trial court explicitly instructed the jury that it could consider the evidence only for the purpose of determining the issues of intent, accident, and mistake, and not for any other purpose. *See* Trial Tr., Vol. IV, at 131; *see also*, *Estelle*, 502 U.S. at 74-75. In light of the express rejection of petitioner's claim by the *Estelle* Court, petitioner cannot show that the admission of this evidence was contrary to, or an unreasonable application of, clearly established federal law. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.      *Ineffective Assistance of Counsel (Claims I & IV)*

Petitioner also contends that both his trial and appellate counsel were ineffective in various respects. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.      *Clearly Established Law*

The Sixth Amendment right to counsel and the corollary right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant

---

[2]Indeed, the evidence was even more probative in petitioner's case than in *Estelle* because, unlike the petitioner in *Estelle*, petitioner here in fact claimed that the child's death was an accident.

18

by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *See id.*
at 687. These two components are mixed questions of law and fact. *See id.* at 698. Further,
"[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both
components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. If "it
is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that
course should be followed." *Id.*

With respect to the performance prong of the *Strickland* test, a strong presumption exists that
counsel's behavior lies within the wide range of reasonable professional assistance. *See id.* at 689;
*O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[Petitioner] must overcome the
presumption that, under the circumstances, the challenged action 'might be considered sound trial
strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel
is strongly presumed to have rendered adequate assistance and made all significant decisions in the
exercise of reasonable professional judgment." *Id.* at 690. With respect to the prejudice prong of
the *Strickland* test, the ultimate inquiry is "whether there is a reasonable probability that, absent
[counsel's] errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

2.    *Trial Counsel*

Petitioner first contends that trial counsel was ineffective in a number of respects.
Specifically, petitioner contends that counsel failed to: (1) conduct a complete investigation; (2)
present exculpatory evidence; (3) object to the prosecutor's knowing use of false testimony; (4)
object to the prior injury evidence on various grounds. The Court should conclude that petitioner
is not entitled to relief on these claims.

Petitioner contends that counsel failed to conduct a complete investigation and present

19

exculpatory evidence that would have questioned when and how the prior injuries to the victim occurred. Specifically, petitioner contends that a Dr. Kosim could have been called to testify that the rib fractures were older than the prosecutor implied, and that a Dr. Wira could have been called to testify that the victim had no tibia fracture at all. With respect to the rib fracture evidence, there was some doubt as to the exact time of those injuries. However, none of the medical doctors testified that the injuries were sustained when the baby was three weeks old. Indeed Dr. Sherrar, the victim's treating physician, testified that he could not determine the date on which the rib injuries occurred. The only evidence relating to the timing of the rib injuries were that they occurred sometime prior to the victim's admission to the hospital, when she was about four weeks old, and petitioner's own testimony that he fell while holding the baby when she was about three weeks old.

It is true that the police investigator's report indicates that Dr. Kosim believed the injuries to be more than 3-4 weeks old at the time the bone scan was performed. *See* Br. in Supp. of Pet., Appx. D. However, this statement is far from definitive as to the timing of the injuries, particularly given the difficulty in establishing a date for a bone fracture, as testified to by Dr. Sherrar and as reflected in Dr. Kosim's estimate of the age of the tibia fracture as being anywhere from one week to three weeks. Further, even at the outside range of four weeks, Dymond was only two days shy of three-weeks old. Thus, contrary to petitioner's argument, nothing in the police report indicates that Dr. Kosim could have testified that the rib fractures occurred in Dymond's first week of life, when petitioner's wife alone was caring for the child.

Further, petitioner simultaneously challenges counsel's failure to call Dr. Kosim to testify about the date of the rib fractures and to call Dr. Wira to testify about the tibia fracture. However, Dr. Kosim definitively told the police that the victim had a tibia fracture. Thus, counsel was faced

20

with a catch-22 in calling Dr. Kosim, because he would also have testified to the existence of a tibia fracture. Further, Dr. Wira's testimony would have offered little help to petitioner regarding the tibia fracture. Although he did state to the police that he could not be certain there was such a fracture, he also stated that it was highly probable that there was such a fracture.

In short, calling Drs. Kosim and Wira may not have helped petitioner, and may have even hurt his case. Petitioner cannot show that counsel's decision not to call these witnesses—which would have kept additional focus on the prior injuries—was an unreasonable tactical decision. Further, in light of Dr. Kosim's equivocal statement regarding the timing of the rib injuries and both doctors' statements regarding the tibia fracture, petitioner cannot show a reasonable probability that, had counsel called these witnesses, the result of the proceeding would have been different. Thus, petitioner cannot show that counsel was ineffective for failing to call Drs. Kosim and Wira.

Likewise, petitioner cannot show that counsel was ineffective for failing to object to his wife's false testimony regarding petitioner's statements during the phone conversation. As noted above, the prejudicial effect of Mrs. Campbell's original testimony regarding petitioner's admission was ameliorated by counsel's cross-examination, which forced her to admit that petitioner had never stated that he squeezed the baby. Thus, petitioner cannot show that the result of the trial would have been different had counsel objected to this testimony, rather than exposed it on cross-examination.

Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on his ineffective assistance of trial counsel claims.

### 3.   *Appellate Counsel*

Finally, petitioner contends that his appellate counsel was ineffective for failing to raise his habeas claims on direct appeal. As noted in connection with the procedural default issue, in order

21

to establish prejudice from appellate counsel's failings, petitioner must show a reasonable probability that his claims would have been successful on appeal. *See Smith*, 528 U.S. at 285-86; *McCleese*, 75 F.3d at 1180. For the reasons explained throughout this Report, petitioner cannot make this showing. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on his ineffective assistance of appellate counsel claim.

G.   *Evidentiary Hearing*

On April 23, 2004, petitioner filed a motion for an evidentiary hearing. Petitioner seeks an evidentiary hearing to develop facts relating to his claims, specifically information relating to the rib and tibia fractures, the prosecutor's knowledge of his wife's false testimony, and counsel's ineffectiveness. The Court should deny petitioner's motion.

In addressing whether an evidentiary hearing is appropriate in a habeas corpus case, a court must consider two separate issues: (1) is an evidentiary hearing necessary under Rule 8 of the Rules Governing Section 2254 Proceedings in United States District Courts, 28 U.S.C. foll. § 2254; and (2) whether a hearing is permitted under 28 U.S.C. § 2254(e)(2).

Regardless of whether a hearing is permitted under § 2254(e)(2), the Court should conclude that an evidentiary hearing is not necessary to resolve petitioner's claims. In making the determination of whether an evidentiary hearing is necessary under Rule 8, "courts focus on whether a new evidentiary hearing would be meaningful, in that a new hearing would have the potential to advance the petitioner's claim." *Campbell v. Vaughn*, 209 F.3d 280, 287 (3d Cir. 2000) (discussing *Cardwell v. Greene*, 152 F.3d 331, 338 (4th Cir. 1998)); *see also, Alcorn v. Smith*, 781 F.2d 58, 59-60 (6th Cir. 1986) (applying pre-AEDPA law); *cf. Townsend v. Sain*, 372 U.S. 293, 312-13 (1963).

As discussed above, petitioner's claims relating to the introduction of the prior acts evidence

22

fall as a matter of law, and thus no further factual development is necessary. Further, regardless of the prosecutor's knowledge of Mrs. Campbell's false testimony, that testimony was not material because the falsity was exposed by counsel on cross-examination. Finally, there is no need for further factual development on petitioner's ineffective assistance claims because, even assuming that Drs. Kosim and Wira could have been called to testify consistently with their statements to the police, there is not a reasonable probability that the result of petitioner's trial would have been different. Thus, further factual development will not in any way advance petitioner's habeas claims. Accordingly, the Court should deny petitioner's motion for an evidentiary hearing.

H.      *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus, as well as his motion for an evidentiary hearing.

III.    NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis*

23

*v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Paul J. Komives

PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: March 29, 2005

24